**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br>**Plaintiff,**<br>**vs.**<br><br>**FEDERAL LOAN MODIFICATION LAW CENTER, LLP**<br>**and**<br>**ANZ & ASSOCIATES, PLC**<br>**and**<br>**VENTURE LEGAL SUPPORT, PLC**<br>**and**<br>**LEGALTURN, INC., a.k.a. LEGAL TURN, INC.**<br>**and**<br>**FEDERAL LOAN MODIFICATION, LLC**<br>**and**<br>**FEDERAL LOAN MODIFICATIONS**<br>**and** | **Case No.: SACV 09-00401-CJC(MLGx)**<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT BOAZ MINITZER** |

**SBSC CORPORATION, also doing business as FEDERAL LOAN MODIFICATION**

**and**

**LEGAL TURN. LLC**

**and**

**NABILE "BILL" ANZ**

**and**

**BOAZ MINITZER**

**and**

**JEFFREY BROUGHTON**

**and**

**STEPHEN OSCHEROWITZ**

**Defendants,**

**and**

**MGO CAPITAL**

**Relief Defendant.**

**INTRODUCTION AND BACKGROUND**

Before the Court is the Federal Trade Commission's ("FTC") motion for summary judgment against Defendant Boaz Minitzer. For the reasons explained below, FTC's motion for summary judgment is GRANTED.

FTC's Second Amended Complaint ("SAC") alleges that Mr. Minitzer is the President of corporate Defendants Federal Loan Modifications and SBSC Corporation, President and an owner of corporate Defendant LegalTurn, Inc., an owner of corporate Defendant Legal Turn. LLC, and the owner of corporate Defendant Federal Loan Modification, LLC. (SAC ¶ 14.) FTC asserts that Mr. Minitzer, through these entities,

directed and participated in a scheme to purport to offer federal loan modification and foreclosure relief services while charging up-front fees from distressed homeowners facing foreclosure. (SAC ¶ 23.) To promote their fraudulent services, Mr. Minitzer and other Defendants "conducted an extensive national advertising campaign" through nationally broadcast television and radio stations and the internet. (SAC ¶ 24.) This campaign prominently featured the word "federal," and several corporate Defendants have names that include the word "federal." (SAC ¶¶ 23, 25.) Defendants also utilized an internet site, "www.fedmod.com," to market their services. (SAC ¶ 27.)

When victims responded to Defendants' advertisements, Defendants' telemarketers typically promised that they could obtain modifications of consumers' loan obligations and even prevent foreclosure. (SAC ¶ 34.) These telemarketers would represent "a success rate in the high ninetieth percentile," and "instruct consumers that they must pay" up-front fees. (SAC ¶¶ 35, 37.) Once they obtained those fees, Defendants frequently "fail[ed] to answer or return consumers' telephone calls or provide updates about the status of Defendants' purported communications with the consumers' lenders." (SAC ¶ 39.) In reality, Defendants "ha[d] not even contacted the [consumers'] lender[s] or . . . had only minimal, non-substantive contacts with the lender[s]." (SAC ¶ 41.) In addition, Defendants often "encouraged consumers to stop paying their mortgages" and "not to contact their lenders." (SAC ¶ 40.) Although Defendants represented that they had full refund policies, consumers had difficulties obtaining such refunds without numerous requests or complaints to "entities such as the Better Business Bureau." (SAC ¶¶ 38, 42.)

Based on these factual allegations, FTC's SAC alleges two counts of violating Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)(1), which prohibits "unfair or deceptive acts and practices in or affecting commerce." The first count asserts that Defendants represented to consumers that they would obtain loan modifications or stop foreclosures but failed to do so "in all or virtually all instances." (SAC ¶¶ 45–46.) The second count

contends that Defendants falsely represented that they were "affiliated with, or endorsed by the United States government or one or more federal government programs." (SAC ¶¶ 48–49.) FTC seeks a judgment for the "full amount of consumer loss" caused by Mr. Minitzer and corporate Defendants and "permanent injunctive relief to prevent him from engaging in the same or reasonably related conduct that would injure consumers, specifically bans on his sale or marketing of any mortgage relief service and any financial-related good or service." (Mem. Supp. Mot. Summ. J. at 1–2.)

**ANALYSIS**

As an initial matter, Mr. Minitzer has failed to file an opposition to FTC's motion for summary judgment. Local Rule 7-12 of the Central District of California addresses a party's failure to file required papers. It states:

> The Court may decline to consider any memorandum or other paper not filed within the deadline set by order or local rule. The failure to file any required paper, or the failure to file it within the deadline, may be deemed consent to the granting or denial of the motion.

Local Rule 7-12. Accordingly, the Court could grant FTC's motion on this ground alone. The Court acknowledges and appreciates that Mr. Minitzer appeared and represented himself *pro se* in the hearing on this motion. His arguments during that hearing, however, were not timely nor the type of evidence that could defeat FTC's well-supported motion.

Summary judgment is proper if the evidence before the Court "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating either that there are no genuine material issues or that the opposing party lacks sufficient evidence to carry its burden of persuasion at trial. *Celotex Corp.*, 477 U.S. at 325; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Once this burden has been met, the party resisting the motion "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

FTC has met its burden to warrant summary judgment on both counts alleged in the SAC. Mr. Minitzer has not properly opposed FTC's motion and has not produced evidence rebutting FTC's detailed allegations and substantial evidence—including consumer and former employee declarations, deposition testimony, undercover calls, sales scripts, and company records—that would permit him to meet his burden of persuasion at trial on either count. He has also failed to raise any genuine issues that would not be appropriate for resolution on a motion for summary judgment. Accordingly, summary judgment is appropriate.

**A. Mr. Minitzer's Violations of the FTC Act**

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). An act or practice is deceptive or misleading if it involves a material misrepresentation that is likely to mislead consumers acting reasonably under the circumstances. *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009). Liability is appropriate even if the misrepresentation was not made for the purpose of inducing consumers to purchase a particular service or good. *FTC v. Gill*, 265 F.3d 944, 955 (9th Cir. 2001).

As to the first count, FTC has extensively documented the nature and extent of misrepresentations made by representatives at entities controlled or owned by Mr. Minitzer concerning those entities' incredible success rate—purportedly exceeding 90%—in obtaining mortgage loan modifications and halting foreclosure proceedings. In reality, those entities did not achieve those results except on behalf of a minority of consumers. This disparity resulted from numerous factors documented by FTC, including that the entities often did not even contact the consumers' lenders and lacked sufficient staff to actually pursue consumers' cases. In the cases where they did correspond with the consumers' lenders, the correspondence was often minimal or insignificant. These misrepresentations made by the Defendants as to the services they provided and the results of those services were also likely to mislead reasonable consumers. This conclusion is bolstered by FTC's evidence that Defendants misled thousands of consumers. *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (Proof of actual deception "is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances").

These misrepresentations were also material. Misrepresentations are material when they "'involve[] information that is important to consumers and, hence, likely to

affect their choice of, or conduct regarding, a product.'" *Id.* (quoting *Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (1984)). Here, the Defendants' representations, which were false and misleading with respect to quality and success rate, made it more likely that consumers would choose to hire Defendants to negotiate their loan modification or attempt to halt foreclosure proceedings.

In its second count, FTC argues that Mr. Minitzer and the entities he controlled or owned misrepresented to consumers that they were affiliated with or endorsed by the United States Government or federal programs. It is uncontested that Defendants were not affiliated with or endorsed in any way by the United States Government. Defendants' advertisements and marketing, however, gave reasonable consumers the impression that they were affiliated with or otherwise endorsed by the federal government or one of its programs. Perhaps the most obvious evidence that Mr. Minitzer and the entities he controlled or owned sought to create such an impression is that two corporate Defendants were named Federal Loan Modification, LLC and Federal Loan Modifications. The testimony of Mr. Minitzer and other Defendants further indicates that Defendants intended to cause consumers to associate these entities with the federal government so that consumers would be more likely to believe that these entities were credible and stable. Toward this end, Defendants' advertisements asked consumers to "stay tuned for [an] important public announcement for those in danger of losing their home." Indeed, FTC has presented evidence that the individual Defendants refused to change the names of these entities or alter their advertising even after their marketing vendors warned them that they were likely creating the appearance of federal sponsorship. *See Kraft, Inc. v. FTC*, 970 F.2d 311, 323 (7th Cir. 1992) (finding it reasonable to infer that an entity intended for advertisements to deceive consumers where the entity ignored warnings that its advertisements were misleading).

Although some of Defendants' advertisements contained disclaimers stating that Defendants were not associated with the government, FTC has presented evidence that these disclaimers were legally insufficient and that the advertisements were likely to mislead consumers despite these disclaimers. Defendants also cannot escape liability based on their subsequent calls to existing customers to notify them that the corporate Defendants were not associated with the federal government. *See Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (per curiam) (deception may be unlawful despite a subsequent truthful disclosure (citing *Exposition Press, Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961)). Even if the calls were effective, Defendants did not begin making them until December 2008, and consumers that hired Defendants after that time did not receive calls.

Defendants' representations creating the impression that they were associated with the federal government or its programs were also material. Consumers were more likely to hire Defendants when they believed Defendants to be associated with the federal government. Not surprisingly, FTC has produced corroborating evidence that reasonable consumers were misled into believing that Defendants were associated with the federal government. *See Cyberspace.com LLC*, 453 F.3d at 1201.

**B. Monetary & Injunctive Relief**

The relief FTC seeks is appropriate in this case. The FTC Act permits the Court to order restitution of fraudulently obtained moneys as well as injunctive relief. *See FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1111, 1113 (9th Cir. 1982) (district court may grant restitution and permanent injunctive relief); *see also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994). Here, FTC asks the Court to award $10,397,260 in restitution and permanently enjoin Mr. Minitzer from engaging in the marketing or sale of mortgage relief, credit repair, tax relief, or other similar goods and services.

District courts have broad authority to appropriately remedy violations of the FTC Act, including awarding damages necessary to accomplish complete justice. *Pantron I Corp.*, 33 F.3d at 1102. A monetary judgment against Mr. Minitzer in his individual capacity is necessary to accomplish complete justice. "An individual is personally liable for a corporation's [FTC Act] § 5 violations if he participated directly in the acts or practices or had authority to control them and had actual knowledge of material misrepresentations, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Cyberspace.com LLC*, 453 F.3d at 1202 (internal quotation marks omitted).

FTC's evidence demonstrates that Mr. Minitzer had authority to control the various corporate Defendants because he (1) was owner and principal of five of the corporate Defendants until at least April 2009; (2) admitted in his testimony that he participated in setting corporate policy, hiring senior management, and had authority over the sales staff; and (3) was a signer on bank accounts of at least four corporate Defendants and used that power to enter business agreements and even pay personal expenses. *See FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1170–71 (finding that president of company with authority to sign documents on behalf of the company had requisite control over the company); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) (control evidenced by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer"). He also had the requisite knowledge of the falsity of the misrepresentations at issue. For example, FTC has provided evidence that he had significant involvement in the creation of the deceptive advertisements. His testimony further reveals that he was aware that sales employees were making misrepresentations as to the services of the corporate Defendants and chose not to terminate those employees to protect profitability. He also received regular reports of consumer complaints.

It is appropriate to hold Mr. Minitzer jointly and severally liable for the collective harms caused by all of the corporate Defendants because those entities operated as a common enterprise. *See FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000) (finding entities were a common enterprise and jointly and severally liable where entities were commonly controlled; shared office space, officers, and employees; and operated as a maze of interrelated companies). Here, the corporate Defendants were interrelated, commonly owned, operated by the same individual Defendants, and shared office space. Additionally, the corporate Defendants passed funds back and forth and used substantially the same advertisements. These factors demonstrate that the Defendants were a common enterprise supporting Mr. Minitzer's joint and several liability.

"In the absence of proof of 'actual damages,' the court [may] properly use[] the amounts consumers paid as the basis for the amount Defendants should be ordered to pay for their wrongdoing." *Gill*, 265 F.3d at 958. "[C]ourts have often awarded the full amount lost by consumers rather than limiting damages to a defendant's profits." *Stefanchik*, 559 F.3d at 931. FTC has relied on bank and other financial records to present persuasive evidence that the Defendant corporate entities received between $12,222,755 and $15,085,789 from consumers from June 1, 2008 until March 31, 2009—the time period during which Mr. Minitzer participated in the business. Subtracting refunds paid to customers, chargebacks, and money paid to payment processors, total revenues during this time period were between $10,397,260 and $11,721,161. Mr. Minitzer has failed to provide contrary evidence. Accordingly, the Court awards a restitution award of $10,397,260 because it is a conservative and reasonable estimate of the losses consumers suffered as a result of the conduct of Mr. Minitzer and the other Defendants in this case.

A permanent injunction is also warranted. The Court previously issued a temporary restraining order, Dkt. # 13, a preliminary injunction, Dkt. # 35, and an amended preliminary injunction, Dkt. # 45, in this case. In conjunction with the present motion, FTC has presented substantial evidence demonstrating that injunctive relief extending beyond the resolution of this case is necessary to safeguard the public. In appropriate cases, the Ninth Circuit permits an injunction to prohibit a defendant from engaging in particular businesses or professional activities. *See Gill*, 265 F.3d at 957 (affirming permanent injunction prohibiting defendant from "engaging in the credit repair business"). Here, the injunction will prohibit Mr. Minitzer's involvement in the marketing or sale of mortgage loan modification or foreclosure relief goods and services. Where necessary, the ban can also be broader than the specific unlawful conduct giving rise to the injunction. *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965). Although the Court takes seriously the implications of permanently enjoining Mr. Minitzer from engaging in the marketing or sale of goods and services in areas other than mortgage loan modification and foreclosure relief, FTC has demonstrated such relief is necessary in light of Mr. Minitzer's integral role in the fraudulent and deceptive marketing and sale of those goods and services. Accordingly, the injunction will, within reasonable limits, prohibit Mr. Minitzer from engaging in the marketing or sale of similar financial goods and services in areas that are often associated with fraud and deceptive practices including credit repair, tax relief, banking, securities, and investments. The necessity of this approach is further supported by FTC's evidence that Mr. Minitzer has marketed and sold both tax relief and debt settlement goods before and after engaging in the activities that are the subject of this suit. Finally, the permanent injunction will prohibit Mr. Minitzer from making express or implicit misrepresentations of material fact in connection with the sale of goods or services. For example, Mr. Minitzer will not be permitted to represent that he is endorsed, approved by, or affiliated with a government entity.

**CONCLUSION**

For the foregoing reasons, FTC's motion for summary judgment against Mr. Minitzer is GRANTED. An appropriate judgment providing for a restitution award and injunctive relief consistent with this Order will also be entered.

DATED: November 17, 2010

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE